**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 15 |
|  | ) |  |
| TECHNICOLOR S.A.,[1] | ) | Case No. 20-33113 (DRJ) |
|  | ) |  |
|  | ) |  |
| Debtor in a Foreign Proceeding. | ) |  |
|  | ) |  |

**VERIFIED PETITION FOR (I) RECOGNITION OF FOREIGN
MAIN PROCEEDING, (II) RECOGNITION OF FOREIGN REPRESENTATIVE,
AND (III) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE**

Laurent Carozzi (the "Petitioner" or "Foreign Representative"), in his capacity as the authorized representative of the above-captioned debtor (the "Debtor") regarding the Debtor's foreign restructuring proceeding, a *sauvegarde financière accélérée* (i.e., "expedited financial safeguard") (the "French Proceeding") before the Tribunal de Commerce de Paris (Commercial Court of Paris) in the French Republic (the "French Court"), respectfully submits this chapter 15 verified petition (together with the official form petition filed concurrently herewith, the "Petition") for recognition of the French Proceeding pursuant to section 1517 of title 11 of the United States Code (the "Bankruptcy Code") as a "foreign main proceeding," or, in the alternative, as a "foreign nonmain proceeding," and for additional relief pursuant to sections 1520 and 1521 of the Bankruptcy Code.

In support of the Petition, the Foreign Representative has filed contemporaneously herewith (a) the *Declaration of Foreign Representative Pursuant to 11 U.S.C. § 1515 and Rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure and in Support of Verified Petition*

---

[1]     The location of debtor Technicolor S.A.'s principal place of business and its service address in this chapter 15 case is 8-10 rue du Renard, 75004 Paris, France.

*for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* (the "Carozzi Declaration")[2] and (b) the *Declaration of Philippe Dubois in Support of Verified Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* (the "Dubois Declaration"), each of which are incorporated herein by reference.

### Preliminary Statement

1.      The Debtor (together with its non-Debtor direct and indirect subsidiaries, "Technicolor") has a storied history as an innovator and leader in media, entertainment services, and the development, creation, and delivery of immersive digital life experiences.  Technicolor is headquartered in Paris, France and has a worldwide presence with more than 14,000 of the industry's premier artists, experts, engineers, researchers, and innovators operating in 27 key media markets worldwide, including the United States, India, and Australia.

2.      Over the past decade, Technicolor has encountered significant and unexpected macroeconomic and industry-specific headwinds that limited its ability to generate cash flows, grow its businesses, and satisfy obligations under its capital structure.  Among other factors, a global shift away from traditional media consumption led to a decline in revenue from traditional consumer electronics and DVD manufacturing.   Global shortages of components used in manufacturing consumer electronics have further contributed to Technicolor's strained liquidity situation.  Compounding matters, the COVID-19 pandemic has caused theatrical releases to be put on hold and production timelines to be pushed back, significantly depressing Technicolor's revenue from production services.

---

[2]      Capitalized terms used herein but not defined have the meanings ascribed to such terms in the Carozzi Declaration.

3.      Technicolor proactively tried to address its balance sheet challenges by undertaking a series of capital markets transactions over the years (including refinancing all of its debt). Notwithstanding these efforts, external factors limited financial performance, growth opportunities, and liquidity.  When coupled with the Debtor's capital structure, these business realities made it apparent that a more comprehensive restructuring transaction was necessary to right-size the Debtor's balance sheet.

4.      In light of the financial difficulties that Technicolor has encountered, on June 18, 2020, Technicolor commenced the French Proceeding pursuant to Articles L. 628-1 *et seq.* of the French Commercial Code.  The ultimate goal of the French Proceeding is to restructure the obligations owed by Technicolor to its creditors (the "Restructuring Transaction") through an expedited financial safeguard plan (the "SFA Plan").[3]

5.      The Restructuring Transaction and SFA Plan contemplate (a) an infusion of new liquidity through €420 million in new debt financing, proceeds of which will be used to repay certain maturing indebtedness, stabilize operations, and fund Technicolor's go-forward business plan, and (b) a reduction in the Debtor's existing funded indebtedness by up to approximately €660 million through a combination of an equity rights offering backstopped by the Debtor's existing lenders via setoff of their claims, and a reserved capital increase to the Debtor's existing lenders that will be fully-subscribed via setoff of their claims (which is effectively an equitization). Approximately 65% of the Debtor's affected financial creditors[4] have already indicated to

---

[3]     The Debtor expects to begin soliciting support for the SFA Plan in accordance with the French Proceeding on or around June 24, 2020.  The Debtor will file the form of SFA Plan with this Court once finalized.

[4]     "Financial creditors" under French law encompasses all banking institutions, financial creditors that have purchased bank debt or trade claims (such as investment or hedge funds), or creditors that have lent money to the debtor by way of a loan (including shareholders who may have granted loans to the company).

Technicolor that they support the key terms of the SFA Plan.[5]  The SFA Plan, described in further detail below, is in line with the Debtor's corporate interests, provides a framework for long-term sustainability for the Debtor's businesses, employees, and customers, and offers its current shareholders an opportunity to participate in the Debtor's restructuring.

6.      The Debtor commenced this chapter 15 case to facilitate the ongoing administration of the French Proceeding and enforce the terms of its eventual SFA Plan.  This chapter 15 case serves an important function in supporting the Debtor's French Proceeding and SFA Plan, principally by preventing certain of the Debtor's stakeholders from commencing actions in the United States that are more properly the subject of the French Proceeding.  Recognition of the French Proceeding will, among other things, ensure that the SFA Plan and any related restructuring transactions are respected in the United States.  For the reasons set forth herein, the Foreign Representative submits that the relief requested in the Petition is necessary and appropriate for the benefit of the Debtor, its creditors, and other parties in interest.

## **Relief Requested**

7.      The Foreign Representative respectfully requests entry of an order, substantially in the form attached hereto (the "Order"), (a) granting the Petition and recognizing the French Proceeding as a "foreign main proceeding" (as defined in section 1502(4) of the Bankruptcy Code) or, in the alternative, as a "foreign non-main proceeding" (as defined in section 1502(5) of the Bankruptcy Code), and granting all of the relief afforded to such proceedings, pursuant to sections 1517(a) and (b) of the Bankruptcy Code, (b) recognizing the Foreign Representative as a "foreign representative" of the Debtor as defined in section 101(24) of the Bankruptcy Code, (c) finding

---

[5]     The Debtor expects to enter into a lockup agreement with such creditors memorializing their commitment to support the SFA Plan in the coming days.

that the Petition meets the requirements of section 1515 of the Bankruptcy Code, (d) granting all relief afforded a foreign main proceeding automatically upon recognition pursuant to section 1520 of the Bankruptcy Code, subject to certain modifications described herein, (e) granting additional relief pursuant to section 1521 of the Bankruptcy Code; (f) providing that no action taken by the Foreign Representative in preparing, disseminating, applying for, implementing, or otherwise acting in furtherance of the French Proceeding and the SFA Plan, any order entered in respect of the Petition, this chapter 15 case, any further order for additional relief in this chapter 15 case, or any adversary proceedings or contested matters in connection therewith, will be deemed to constitute a waiver of any immunity afforded to the Foreign Representative, including, without limitation, pursuant to section 1510 of the Bankruptcy Code, and (g) granting such other relief as the Court (as defined herein) deems just and proper.

### Jurisdiction and Venue

8.      The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).  The Debtor confirms its consent, pursuant to Bankruptcy Rule 7008, to the entry of a final order by the Court.

9.      This chapter 15 case has been properly commenced pursuant to section 1504 of the Bankruptcy Code by the filing of a petition for recognition of the French Proceeding under section 1515 of the Bankruptcy Code.

10.      Venue is proper pursuant to 28 U.S.C. § 1410(1).  The Debtor's principal assets in the United States constitute $50,000 deposited in a bank account maintained at East West Bank in Houston, Texas.

11.      The bases for the relief requested herein are sections 105(a), 362, 363, 1504, 1507, 1510, 1515, 1517, and 1521 of the Bankruptcy Code.

## Background

### I.   Technicolor's Corporate History.

12.    Technicolor is among the world's leading content creation-to-distribution companies, using its scale, technology, and expertise to deliver professionally created content to a worldwide market.  For more than 100 years, Technicolor has been an industry leader in providing production and distribution services to Hollywood studios, independent filmmakers, music producers, video game and software developers, brands, and anyone looking to tell stories and create experiences for audiences.  Providing one of the industry's most comprehensive suites of end-to-end media services, Technicolor is uniquely positioned to transform, innovate, manage, and deliver content to homes and devices around the world.

### II.   Technicolor's Business Operations.

13.    Technicolor broadly operates its customer-facing business in three primary segments:  Connected Home, Production Services, and DVD Services.  Each of these business segments enjoys a position as a market leader, a diversified customer base, and opportunities for growth.

#### A.   Connected Home.

14.    Technicolor's Connected Home business segment focuses on creating the technology and devices that deliver content to customers, such as broadband modems and gateways, digital set top boxes, and other connected devices ("Customer Premise Equipment"). Connected Home's Customer Premise Equipment falls into two main categories: broadband and video.  In broadband, Technicolor produces devices for cable, telecom, and mobile providers to deliver video, voice, data, and mobility services to their customers over fixed wire and wireless networks.  Examples of these devices include cable boxes and internet routers, modems, and gateways.  In video, Technicolor's Customer Premise Equipment is designed for cable, satellite,

telecom, and mobile providers to deliver digital video and advanced services over broadband, broadcast, and hybrid networks.  These products enable internet service providers to deliver broadcast and internet television, and over-the-top media services—such as Netflix, Amazon, and Hulu—in standard, high, and ultra-high definition.  In addition, Connected Home is a leader in delivering the Android-TV platform, a version of Google's popular Android operating system that is specifically designed for televisions and digital media players.

15.     Connected Home enjoys positive industry trends and a growing market size, brought about by worldwide increasing internet traffic, growing demand for over-the-top services, and the connectivity of millions of additional devices.  With the increasing amounts of data that will cross global IP networks in the next few years, households will demand greater connectivity speed and more varied services from their cable and internet service providers.  As a result, Customer Premise Equipment continues to become more complex and powerful, incorporating artificial intelligence and deep learning algorithms to arrive at a more sophisticated degree of network access and varied service offerings.  Technicolor is poised to take advantage of these trends as an established worldwide leader in production of Customer Premise Equipment and a trusted partner to the world's largest internet and cable providers.

16.     In 2019, Connected Home generated consolidated revenues of €1.983 billion, accounting for approximately 52% of the Company's reported consolidated revenues.  In addition, it shipped a total of 35.4 million products, representing more than 680,000 devices per week.  Of that, video devices represented 55% of total volumes in 2019, while broadband devices represented 45% of total shipments.  Technicolor's customer base includes most of the largest pay-TV operators and network service providers worldwide, including AT&T, Charter Comcast, and Cox.

17.     In November 2015, in response to industry consolidation and in an effort to deliver more value through economies of scale and greater market share, the Company acquired Cisco Connected Devices.  This acquisition doubled the size of its Connected Home division and increased its industrial and technological scale across all major geographies, particularly in North America, the largest market in volume and value.  Connected Home also has a strong presence in Europe, the Middle East, and Africa, where it has maintained a solid leadership position in telecom and cable devices.  In Latin America, Connected Home is well established with major Customer Premise Equipment Customers, driving a high market share both in value and volume.  In Asia, Technicolor has focused on building its position in targeted geographic markets and has reported solid growth in South Korea and Japan.

**B.     Production Services.**

18.     Technicolor's Production Services business segment enables content and commercial creators around the world to bring their creative visions to life.  It provides award-winning visual effects ("VFX"), animation, and post-production services for films, television series, advertising, video games and other audiovisual content.  It is made up of industry leading visual effects and post-production brands, including the Moving Picture Company, Mikros Animation, and The Mill.

19.     Production Services is organized under three primary service lines:  film and episodic VFX, advertising, animation and games, and post-production.  This structure is designed to foster synergies within each segment among different post-production brands and to position Technicolor to lead future technological waves across each market segment.

20.     Production Services is well-positioned for significant growth.  The demand for high-end content creation has significantly increased over the past few years, driven by

industry-wide development of premium original content, particularly by over-the-top providers such as Netflix, Amazon, and Hulu.  Demand for Technicolor's services has been bolstered by VFX-heavy feature film franchises like Disney's Marvel Cinematic Universe and Warner Brother's DC Extended Universe.  The past year has been a harbinger for yet more growth opportunities with launches of major streaming platforms like Apple TV+, Disney+, NBCUniversal's Peacock, WarnerMedia's HBO Max, and Quibi.  In addition, digital advertising expenditures are growing faster than traditional television advertising, driven by an increasingly wide variety of devices and formats for consumer outreach.

21.     Production Services' animation service line is poised to expand as a shift in the industry has presented greater opportunities for third-party animation service providers.  While the major studios' computer generated animated films continue to lead box offices, a growing number of studios have become more open to outsourcing animation services.  This change has been brought about by significant investments in animated content made by over-the-top providers (*i.e.,* Netflix, Amazon, and Hulu).  The video games services market also is expanding as mobile game developers seek higher quality images and art across all platforms.  As an established leader in VFX services, animation, and post-production, Technicolor is well-positioned to take advantage of opportunities in these growing markets.

22.     Revenues for production services were €893 million in 2019, reflecting an increase of over €100 million from 2018.  Technicolor has strategically expanded to meet growing consumer demand for high-end content, in particular through its announcement at the end of January 2020 of the official launch of its new episodic visual effect business, MPC Episodic.  In 2019 alone, Technicolor provided work to major studios on over 30 films, including prominent titles such as *The Lion King* (Disney), *1917* (Universal/Amblin), *X-Men: Dark Phoenix* (Fox),

*Pokémon Detective Pikachu* (Warner Brothers/Legendary).  In addition, Technicolor worked on over 30 episodic and non-theatrical (*i.e*, streaming or over-the-top platforms such as Netflix, Amazon, or Hulu) projects such as *The Mandalorian* (Disney+), *See* (Apple TV+), *Old Story* (Netflix), and *The Boys* (Amazon/Sony).

23.     Aside from film, Production Services reported a series of other successes in 2019. In advertising, it received awards for VFX at the prestigious Cannes Lions International Festival of Creativity, launched a new studio in Berlin, Germany, and contributed to approximately 4,800 commercials.  In post-production services, it provided services to major films and episodic projects, such as *Aladdin* and *Big Little Lies*, opened a new facility in Cardiff, Wales, and provided services to over one hundred theatrical features and nearly three hundred television and over-the-top series, mini-series, and pilots.  In animation, Production Services delivered approximately 3,600 minutes of animation for leading animated television shows and feature films, and created over 49,000 computer generated assets for top-selling video games, animated television series, and feature films.

**C.     DVD Services.**

24.     Technicolor's DVD Services business segment is the worldwide leader in replication, packaging, and supply chain solutions for packaged media and related products serving global content producers across film, television, games, and music.  As one of the world's largest manufacturers and distributors of pre-recorded discs, the DVD Services segment manufactured over one billion discs in 2019.  Given its presence in Europe, the Americas, and Oceania, Technicolor's DVD Services has the unique capacity to support its clients on a global scale.

25.     Technicolor runs strategically-positioned manufacturing facilities in Guadalajara, Mexico and Piaseczno, Poland, which are supported by facilities dedicated to packaging and

distribution in the United States, Europe, and Australia.  In the United States, DVD Services operates primarily from its Memphis, Tennessee and Huntsville, Alabama facilities.

26.     As a global market leader, Technicolor's key customers include major Hollywood studios, such as Warner Brothers, The Walt Disney Company, Paramount, Universal, Sony, Fox, and Lionsgates, independent film studios, software and games publishers and major music publishers.  The package and media business remains a large and profitable revenue source for content creators, and Technicolor believes there will be continuing consumer demand for physical ownership of content.  As an undisputed worldwide leader in production of physical content, Technicolor is uniquely positioned to take advantage of this narrowing market space.

27.     In 2019, revenues for DVD Services totaled €882 million, significantly down compared to 2018.  In the second half of 2019, revenues decreased by 12.1% compared to the second half of 2018.  DVD Services replicated 1,059 million discs in 2019, down 11.4% from the number of volumes replicated in 2018.

**III.    Technicolor's Prepetition Corporate and Capital Structure.**

28.     The Debtor is *société anonyme* organized under the laws of France, and its common shares are publicly traded and listed on the Euronext Paris Exchange.  As of December 31, 2019, the Debtor's share capital was divided into 15,350,414 shares with a nominal value of €0.01 each, fully paid up and all in the same class.  A significant portion of the Debtor's shares and voting rights are held by institutional and retail investors, with a significant position held by RWC Asset Management LLP (10.13%).  A simplified chart depicting Technicolor's organizational structure is attached to the Carozzi Declaration as Exhibit A.

29.     As of the Petition Date, the Debtor and certain of its U.S. subsidiaries are obligors (either as borrower or guarantor) on a principal amount of prepetition funded indebtedness totaling approximately  $477.8 million  of  U.S.  dollar-denominated  debt  and  €977 million  of

Euro-denominated debt, comprising four distinct credit facilities as described in the following sections.[6]

### B.    The Euro Revolving Credit Facility.

30.    The Debtor, as borrower, is party to that certain revolving facilities agreement, dated as of December 21, 2016, with the lenders from time to time party thereto (the "Euro RCF Lenders"), Natixis, as agent, and Citibank N.A., London Branch, as security agent (as amended, restated, or otherwise modified from time to time, the "Euro RCF Agreement").  The Euro RCF Agreement provides for a revolving credit facility in the aggregate commitment amount of €250,000,000 (the "Euro RCF").  To secure the obligations under the Euro RCF Agreement, the Debtor, among other things, pledged 100% of its shares in its wholly-owned direct U.S. subsidiary, Technicolor USA, Inc. ("Technicolor USA").  Other than certain New York law-governed negative covenants, the Euro RCF Agreement is governed by English law.  As of the Petition Date, there is approximately €250.4 million in outstanding obligations (including principal and accrued interest) under the Euro RCF.

### C.    The Term Loan.

31.    The Debtor, as borrower, is party to that certain credit agreement, dated as of December 6, 2016, with the lenders from time to time party thereto (the "Term Loan Lenders"), Citibank N.A., London Branch, as collateral agent, J.P. Morgan Europe Limited, as administrative agent, and J.P. Morgan Limited and Citigroup Global Markets Limited, as joint bookrunners (as amended, restated, or otherwise modified from time to time, the "Term Loan Credit Agreement").  On March 30, 2017, the Debtor entered into that certain first incremental amendment and joinder agreement whereby Goldman Sachs International Bank provided incremental term loans in the

---

[6]    The summaries provided herein are qualified in their entirety by the provisions of the relevant credit documents.

aggregate principal amounts of €275,000,000 and $300,000,000.  On the same day, the Debtor entered into that certain receivables pledge agreement with Citibank, N.A., London Branch as collateral agent and the beneficiaries named therein, pursuant to which the Debtor pledged receivables it owns with respect to its subsidiaries for the benefit of the Term Loan Lenders.

32.    The Term Loan Credit Agreement provides for Euro-denominated term loans in the aggregate principal amount of €725,000,000 (the "Euro Term Loans") and U.S. dollar-denominated term loans in the aggregate principal amount of $300,000,000 (the "USD Term Loans" and, together with the Euro Term Loans, the "Term Loans").  As with the Euro RCF Agreement, the Debtor pledged 100% of its shares in Technicolor USA to secure the obligations under the Term Loan Credit Agreement.  The Term Loan Credit Agreement is governed by New York law.

33.    The respective rights and obligations of the Euro RCF Lenders and the Term Loan Lenders are governed by that certain intercreditor agreement, dated July 11, 2013, between the Debtor, certain of the Debtor's affiliates, Citibank, N.A., London Branch, as collateral agent, the Bank of New York Mellon acting through its London Branch, as RCF agent and administrative agent, and certain other parties thereto (as amended, restated, or otherwise modified from time to time, the "RCF/Term Loan Intercreditor Agreement").[7]  The Euro RCF is *pari passu* and shares collateral with the Term Loans.

---

[7]    Pursuant to that certain creditor accession undertaking made on December 21, 2016, by Natixis, as agent under the Euro RCF Credit Agreement, and the "Acceding Additional Creditors" (as defined therein), the secured parties to the Euro RCF Credit Agreement acceded to the existing intercreditor agreement between the term loan agent and the agent under the preceding revolving credit facility.

34.     As of the Petition Date, there is approximately €726.5 million of obligations outstanding under the Euro Term Loans and $290.8 million of obligations outstanding under the USD Term Loans (in each case including principal and accrued interest).

**D.      Wells Fargo Revolver.**

35.     Technicolor USA and certain of its subsidiaries, as borrowers, are party to that certain amended and restated credit agreement, dated as of November 6, 2017, with Wells Fargo Capital Finance, LLC, as lender and agent (as amended, restated, or otherwise modified from time to time, the "Wells Fargo RCF Agreement").  The Wells Fargo RCF Agreement provides for a revolving credit facility in the aggregate commitment amount of $125,000,000 (the "Wells Fargo RCF").  The Wells Fargo RCF Agreement is governed by California law.  As of the Petition Date, there is approximately $76.3 million in outstanding obligations under the Wells Fargo RCF (including principal and accrued interest).  All obligations under the Wells Fargo RCF Agreement, and the guarantees of those obligations, are secured by substantially all assets of the Technicolor USA and the borrowers party thereto.  The collateral is subject to an intercreditor agreement, dated as of March 5, 2020, by and between Wells Fargo Capital Finance, LLC, as agent of the Wells Fargo RCF Agreement and JPMorgan Chase Bank, N.A., as agent of the Bridge Loan Credit Agreement (defined below) (the "US Intercreditor Agreement"), which governs the relative priority in the collateral as between the Wells Fargo RCF Agreement lenders and the Bridge Loan Credit Agreement lenders.

36.     While the Debtor is currently not directly obligated under the Wells Fargo RCF Agreement, certain of its material subsidiaries, the residual value of which flows to the Debtor, are, and the Debtor is required to be reinstated as a guarantor under the Wells Fargo RCF Agreement within ten days of satisfaction of the outstanding obligations under the Bridge Loan Credit Agreement.

### E.    Bridge Term Loan.

37.    Technicolor USA, as borrower, is party to that certain credit agreement, dated as of March 5, 2020, with the lenders party thereto (the "Bridge Loan Lenders") and JPMorgan Chase Bank, N.A., as agent (the "Bridge Loan Credit Agreement"), which provides for a tranche A term loan in the initial amount of $85,000,000 and a tranche B term loan in the amount of $25,000,000 (together, the "Bridge Loan").  All obligations under the Bridge Loan, and the guarantees of those obligations, are secured by substantially all assets of the Technicolor USA and the guarantors party thereto and subject to the US Intercreditor Agreement.  As of the Petition Date, there is approximately $110.7 million of outstanding obligations under the Bridge Loan (including principal and accrued interest).  While the Debtor is not directly obligated under the Bridge Loan Credit Agreement, certain of its material subsidiaries, the residual value of which flows to the Debtor, are.  Moreover, one of the principal purposes of the Debtor's restructuring is to ensure that the Bridge Loan is repaid in full when it becomes due and payable on July 31, 2020.

### F.    Subordinated Perpetual Notes.

38.    On September 26, 2005, Technicolor issued deeply subordinated perpetual notes in a nominal amount of €500 million (the "Subordinated Perpetual Notes").  The Subordinated Perpetual Notes no longer bear interest and are not repayable other than (a) at Technicolor's sole option in specific contractually-defined events or (b) in the event of a liquidation.

39.    The Subordinated Perpetual Notes are unaffected by the French Proceeding, and the consent of holders thereof is not required to implement the Restructuring Transaction.

## IV.   The French *Sauvegarde Financière Accélérée* (or "Expedited Financial Safeguard") Proceeding.

40.    As more fully set forth in the Dubois Declaration, French expedited financial safeguard proceedings are opened at the request of a debtor already involved in ongoing

conciliation proceedings.  Conciliation proceedings are court-assisted, preventive and confidential proceedings aimed at facilitating negotiations and reaching a consensual workout agreement between a company and its creditors under the supervision of a court-appointed agent, the *conciliateur*.  To open expedited financial safeguard proceedings, the debtor must demonstrate to the French court that it meets certain eligibility requirements, including that the restructuring proposal prepared in the framework of conciliation proceedings is sufficiently supported by the company's financial creditors so that its approval by at least a two-thirds majority of the company's financial creditors and, if applicable, bondholders, is likely to occur within the expedited deadlines imposed by the expedited financial safeguard proceedings.[8]  Issuance of the opening judgment in an expedited financial safeguard proceeding triggers an automatic stay that prohibits payment of financial prepetition debts to and enforcement actions by the financial creditors whose debts are subject to the proceeding, but not trade creditors, whose claims are paid in the ordinary course and otherwise "ride through" unimpaired.

### A.     Technicolor's Conciliation and the French Proceeding.

41.     In February 2020, the Debtor announced its intention to launch a €300 million rights issue by June 30, 2020, which rights issue was authorized by the general meeting of the Debtor's shareholders on March 23, 2020.  Since that time, the impact of the global COVID-19 pandemic and the uncertainty in global market conditions on the Debtor's business operations have limited the Debtor's ability to launch the initially-contemplated rights issue pursuant to the original timeline and have exacerbated the Debtor's liquidity needs.  Accordingly, in May 2020, the Debtor launched a confidential process aimed at raising a new money facility to replace the rights issue in order to finance the Debtor's operations and to repay the Bridge Loan.

---

[8]     The French Proceeding does not contemplate affecting the rights of any bondholders of the Debtor.

42.     The Debtor received offers from third parties and existing creditors, including, notably, an offer from a group of creditors at the time representing 59% of the principal amounts outstanding under the Term Loan Credit Agreement and the Euro RCF Credit Agreement.  This proposal addressed the Debtor's liquidity requirements and need to deleverage its balance sheet through a combination of a rights issue (fully backstopped by the Term Loan Lenders and the Euro RCF Lenders by way of set-off of their claims) and a capital increase reserved to the Term Loan Lenders and the Euro RCF Lenders (similarly subscribed by way of set-off of their claims).

43.     Accordingly, as noted in the Carozzi Declaration, prior to commencing the French Proceeding, the Debtor opened conciliation proceedings on June 2, 2020 (the "Conciliation").  During the course of the Conciliation, the Debtor, with the assistance of the court-appointed *conciliateurs* Hélène Bourbouloux and Gaël Couturier (collectively, the "Conciliators"), held multiple meetings with its creditors, including the Term Loan Lenders and the Euro RCF Lenders, regarding the terms of a comprehensive debt restructuring.  This culminated in the negotiation of waivers of certain events of default that would otherwise have been triggered by the opening of the French Proceeding and an agreement in principle on the terms of a lockup agreement that the Debtor expects to execute with holders of approximately 65% in principal amount outstanding under the Term Loan Credit Agreement and Euro RCF Credit Agreement in the coming days, memorializing creditor support for the terms of the new money financing and a comprehensive restructuring of the Debtor's financial debt.[9]  Because such support fell short of the 100% consent required to approve the restructuring plan absent the opening of the French Proceeding, but having received sufficient support from its lenders to open

---

[9]     The deadline for the Debtor to enter into lockup agreements with creditors eligible to vote on the SFA Plan is July 2, 2020, i.e., the day before the deadline for creditors to vote on the SFA Plan.

the French Proceeding, the Debtor filed a *demande d'ouverture de procédure de sauvegarde financière accélérée* (i.e., petition for expedited financial safeguard) on June 18, 2020. The French Court heard the petition on June 22, 2020, and issued the Opening Judgment formally opening the French Proceeding on June 22, 2020.[10]

### B.    The Debtor's SFA Plan.

44.    Following issuance of the Opening Judgment, on or around June 24, 2020, the Debtor expects to distribute the SFA Plan to financial creditors entitled to vote thereon. Interested parties will also be able to request a copy of the SFA Plan from the French Court. The vote of the affected creditors to approve or reject the SFA Plan will be convened on July 3, 2020.

45.    The framework of the SFA Plan contemplates a comprehensive deleveraging of Technicolor's balance sheet through a combination of:

- €420 million in new-money financing (the "New Money"), made available to the Debtor and its affiliates, as follows:

    - the first tranche of New Money (the "US New Money") will be made available mid-July to the Debtor's direct subsidiary, Technicolor USA, Inc., by way of a term loan facility governed by New York law in order to repay the Bridge Loan in full in cash;

    - a second tranche of New Money will be made available in mid-July to Tech 6, a French-incorporated direct subsidiary of the Debtor, by way of a notes issue under New York law (the "Initial FR New Money" and, together with the US New Money, the "Initial New Money");

    - a third tranche of new money will be made available to Tech 6 at the end of August 2020;

    - the New Money will be secured by a "*fiducies-sûretés*" (a French law trust) in respect of the shares sub-holding companies that hold substantially all of the Debtor's subsidiaries (the "*Fiducies*")[11] and certain other security interests,

---

[10]   The Debtor will file the Opening Judgment and an English translation of the Opening Judgment with the Court after the Opening Judgment becomes available from the French Court.

[11]   Implementation of the *Fiducie* for the third tranche of the New Money will be submitted to a consultative vote of the Debtor's shareholders at an extraordinary general meeting, in accordance with AMF recommendation

including security over the assets currently securing the Term Loans and the Euro RCF and, for the US New Money only, by security over the assets currently securing the Bridge Loan; and

- the implementation of the Fiducie for the remainder of the New Money will be submitted to a consultative vote of an extraordinary general meeting of Technicolor's shareholders (the "EGM"), in accordance with the AMF recommendation n°2015-05 on transfer of assets.

- an extension of the maturity date under the Wells Fargo RCF;

- a combination of equity rights issue and equitization that together will reduce the outstanding debt under the Term Loan Credit Facility and the Euro RCF by up to approximately €660 million (on a *pari passu* basis), which will be structured as follows, subject to (i) availability of the New Money, (ii) a positive vote at the EGM on all resolutions relating to the SFA Plan, and (iii) approval of the AMF on a prospectus:

  - a rights issue of the Debtor, with shareholders' preferential subscription rights, for a total amount of €330 million, at a subscription price of €2.98 per share, fully underwritten by the Term Loan Lenders and the Euro RCF Lenders by way of set-off of their claims.  Cash proceeds of the rights issue will be used in full to repay the Term Loans and the Euro RCF pro rata, at par value;

  - a reserved capital increase of the Debtor for the total amount of €330 million at a subscription price of €3.58 per share, reserved to the Term Loan Lenders and the Euro RCF Lenders and which will be fully subscribed by way of set-off of their claims at par;

  - free warrants to be allocated to the New Money lenders, with a three-month maturity and exercise price of €0.01, equal to the par value of the shares, and representing 7.5% of the fully-diluted equity of the Debtor (but before allocation of the free warrants to the shareholders); and

  - free warrants to be allocated to existing shareholders at the time of launching the rights issue, with a four-year maturity and an exercise price equal to the reserved capital increase price (i.e., €3.58).  The free warrants will represent 5% of the fully-diluted equity after the rights issue, the reserved capital increase, and the coordination warrants.

---

n. 2015-05 regarding transfer of assets.  "AMF" is the *Autorité des Marchés Financiers*, the French financial markets regulator.

46.     The remaining debt under the Term Loan Credit Facility and Euro RCF will be reinstated under a single term loan facility with its maturity extended to December 31, 2024 (with a lump sum payment for the full principal amount of the loan made at the time of maturity).

47.     This comprehensive restructuring will be effected over the course of the next few months.  The New Money will become available in multiple drawdowns, with the first drawdown expected to occur in mid-July, subject to (a) approval of the *juge-commissaire* appointed in the French Proceeding pursuant to the Opening Judgment and (b) an affirmative vote on the SFA Plan by the class of financial creditors.[12]  This first drawdown will be split into two tranches:  the $110 million US New Money that will be used to repay the Bridge Facility in full before the end of July and the €140 million Initial FR New Money to be used for general corporate purposes that will fund ongoing operations while the Debtor completes its restructuring.

48.     Assuming the requisite approvals of the *juge-commissaire* and creditors are obtained and subsequent to the mid-July infusion of new money, the Debtor will seek approval of the SFA Plan at an extraordinary general meeting of its shareholders, which the Debtor expects to be held on July 20, 2020.  Such approval is required to modify the Debtor's bylaws as required to implement certain equitization transactions contemplated by the SFA Plan.  As a French listed company, the threshold for a quorum at the extraordinary general meeting is 25% of the shareholders on the first convening notice and 20% on the second.  The voting shareholders must approve the SFA Plan by a two-thirds majority for it to become effective.[13]  Under the SFA Plan,

---

[12]    The Debtor will file a copy of the order approving the first two tranches of the New Money when available.

[13]    By exception, the French Court may hold that the SFA Plan may be approved by a simple 50% majority on the first convening notice if a quorum representing at least 50% of shareholders is reached.

existing shareholders will retain their equity interests, subject to dilution on account of the equity rights offering and partial equitization of the Euro RCF and Term Loan Credit Facility.

49.     In the event that the Debtor's shareholders vote in favor of the SFA Plan, the French Court will hold a hearing to consider approval of the SFA Plan and the transactions contemplated thereby.  If the French Court is satisfied that the SFA Plan meets the applicable requirements of French law, the SFA Plan will be approved and the Debtor and its stakeholders will proceed with consummation thereof, including the infusion of additional new money financing and the equitization of up to approximately €660 million of the Euro RCF and Term Loans.

50.     In the event that the Debtor's shareholders vote against at least one of the resolutions under the SFA Plan, the SFA Plan cannot be approved by the French Court. Consequently, the Debtor would petition the French Court to terminate the French Proceeding and file for *redressement judiciaire* (rehabilitation proceedings).  A second extraordinary general meeting of the shareholders may subsequently be convened at the end of August 2020, if deemed opportune, to vote on the restructuring.  If a favorable vote is achieved at the second shareholders' general meeting, the restructuring will be implemented as part of a court-approved *plan de continuation* (rehabilitation plan).  If the shareholders do not return a favorable vote, the New Money providers will set up a French acquisition vehicle to (a) file a bid offer on substantially all the Debtor's assets as part of a sale and marketing process conducted in the rehabilitation proceedings (with an undertaking to maintain all employment contracts and repay all of the Debtor's legally-privileged creditors) and/or (b) obtain, through a liquidation process, all or part

of the Debtor's residual assets that were not transferred through the bid process.  This process is similar to a "credit bid" under United States bankruptcy law.

**Basis for Relief**

51.     Chapter 15 of the Bankruptcy Code is designed to promote cooperation and comity between courts in the United States and foreign courts, to protect and maximize the value of a debtor's assets, and to facilitate the rehabilitation and reorganization of businesses.  The relief afforded to a foreign debtor under chapter 15 is intended to avoid disruptions that could otherwise derail a debtor's restructuring in its home country.

52.     Consistent with these principles, the Foreign Representative commenced an ancillary proceeding for the Debtor under chapter 15 of the Bankruptcy Code to obtain recognition of the French Proceeding and certain related relief.  The Foreign Representative believes that this chapter 15 case will complement the Debtor's primary proceeding in France to ensure the effective and economic administration of the Debtor's restructuring efforts and prevent parties from taking action in the United States that jeopardizes these efforts.

**I.      The Debtor Is Eligible for Chapter 15 Relief.**

53.     The Debtor is eligible to be a debtor in a chapter 15 case.  For the purposes of chapter 15 of the Bankruptcy Code, a "debtor" means an entity that is the subject of a foreign proceeding.  *See* 11 U.S.C. § 1502(1); *see also* 11 U.S.C. § 101(15), (41) (defining "entity" and "person").  The Debtor is a *société anonyme* organized under the laws of France.  As set forth below, the French Proceeding is a foreign proceeding as that term is defined in the Bankruptcy Code.  The Debtor does not fall within any of the categories of entities excluded from chapter 15 eligibility, as set forth in section 1501(c).  Accordingly, the Debtor is eligible for relief under chapter 15 of the Bankruptcy Code.  *See* 11 U.S.C. § 1501(b), (c).

**II.     The French Proceeding Should Be Recognized as Foreign Main Proceeding or, in the Alternative, as a Foreign Nonmain Proceeding.**

54.     Section 1517(a) of the Bankruptcy Code provides that, after notice and hearing, a court shall enter an order recognizing a foreign proceeding as a foreign main (or nonmain) proceeding if (a) such foreign proceeding is a foreign main (or nonmain) proceeding within the meaning of section 1502 of the Bankruptcy Code, (b) the foreign representative applying for recognition is a person or body, and (c) the petition meets the requirements of section 1515 of the Bankruptcy Code.  *See* 11 U.S.C. § 1517(a).  As explained below, the French Proceeding, the Foreign Representative, and the Petition satisfy all of the foregoing requirements.

**A.     The French Proceeding Is a Foreign Proceeding.**

55.     Section 101(23) of the Bankruptcy Code defines a "foreign proceeding" as:

> a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.

56.     Courts have held that a "foreign proceeding" is:

a.     a proceeding;

b.     that has either a judicial or an administrative character;

c.     that is collective in nature, in the sense that the proceeding considers the rights and obligations of all creditors;

d.     that is located in a foreign country;

e.     that is authorized or conducted under a law related to insolvency or the adjustment of debt, even if the debtor that has commenced such proceedings is not actually insolvent;

f.     in which the debtor's assets and affairs are subject to the control or supervision of a foreign court or other authority competent to control or supervise a foreign proceeding; and

g.     which proceeding is for the purpose of reorganization or liquidation.

*See In re Ashapura Minechem Ltd.*, 480 B.R. 129, 136 (S.D.N.Y. 2012) ("(i) [The existence of] a proceeding; (ii) that is either judicial or administrative; (iii) that is collective in nature; (iv) that is in a foreign country; (v) that is authorized or conducted under a law related to insolvency or the adjustment of debts; (vi) in which the debtor's assets and affairs are subject to the control or supervision of a foreign court; and (vii) which proceeding is for the purpose of reorganization or liquidation.") (citing *In re Betcorp Ltd.*, 400 B.R. 266, 277 (Bankr. D. Nev. 2009)); *see also In re ABC Learning Ctrs. Ltd.*, 728 F.3d 301, 308 (3d Cir. 2013) (listing the seven factors); *In re Oversight & Control Comm'n of Avánzit, S.A.*, 385 B.R. 525, 533 (Bankr. S.D.N.Y. 2008) (discussing factors).  As set forth in the Dubois Declaration, the French Proceeding satisfies such requirements and, therefore, qualifies as a "foreign proceeding" for purposes of section 101(23) of the Bankruptcy Code.

57.    ***First***, the French Proceeding is a proceeding commenced pursuant to Articles L. 628-1 *et seq.* of the French Commercial Code, the French law that governs corporate reorganizations and provides for a restructuring of a company's financial obligations.  For purposes of chapter 15 recognition, "the hallmark of a 'proceeding' is a statutory framework that constrains a company's actions and that regulates the final distribution of a company's assets." *Betcorp*, 400 B.R. at 278.  Because the French Proceeding operates under such statutory framework, it satisfies the first factor of section 101(23) of the Bankruptcy Code.

58.    ***Second***, the French Proceeding is judicial in character.  A reorganization proceeding is judicial in character whenever a "court exercises its supervisory powers."  *In re ABC Learning Ctrs. Ltd.*, 445 B.R. 318, 328 (Bankr. D. Del. 2010).  In the Debtor's French Proceeding, the French Court has exclusive jurisdiction and the Debtor's assets and affairs are subject to the supervision of the *juge-commissaire* who, among other things, must authorize any sale of the

24

Debtor's assets outside the ordinary course of business, or the granting of any security interest in the Debtor's assets.  Moreover, the scope of the court-appointed *administrateur judiciaire*'s duties—which includes assisting the Debtor's management or monitoring the Debtor—is decided by the French Court, and the *administrateur judiciaire* reports to the French Court in the event of an issue requiring its input.  Additionally, as described herein, the French Court must also approve the SFA Plan (including any reorganization of the Debtor's assets and affairs regulated under the SFA Plan) for the SFA Plan to take effect.

59.     ***Third***, the French Proceeding is collective in nature in that all affected creditors are allowed to participate.  In *Betcorp*, for instance, the bankruptcy court discussed the contrasts between a true collective proceeding, where such proceeding "considers the rights and obligations of all creditors" and a non-collective proceeding, such as a "receivership remedy instigated at the request, and for the benefit, of a single secured creditor."  *See* 400 B.R. at 281; *see also In re Poymanov*, 571 B.R. 24, 33 (Bankr. S.D.N.Y. 2017) ("A proceeding is collective if it considers the rights and obligations of all of a debtor's creditors, rather than a single creditor.").  The French Proceeding is accordingly intended to affect creditors according to their interests collectively, rather than to benefit any single creditor alone.  A *mandataire judiciaire*, appointed to represent the creditors, is entitled to act in the name of and on behalf of all creditors to, among other things, verify the debtors' liabilities.  Moreover, a committee of financial institutions that are lenders under the Debtor's prepetition credit facilities, which will be impacted by the SFA Plan, has been appointed.  The lenders comprising the committee consulted on the SFA Plan in connection with the conciliation and will participate in and vote on the SFA Plan.  Accordingly, the French Proceeding considers the rights and obligations of all of the Debtor's financial creditors collectively rather than evaluating those of any single creditor.

60.     **Fourth**, the French Proceeding is conducted in a foreign country, namely France, and the French Court that will oversee the case is located in Paris, France.

61.     **Fifth**, as described above, a "foreign proceeding" is "a law relating to insolvency or adjustment of debt."  Notably, the definition of "foreign proceeding" in the Bankruptcy Code differs from the definition found in the Model Law because the Bankruptcy Code includes the words "or adjustment of debt."  *See In re Millard*, 501 B.R. 644, 649–50 (Bankr. S.D.N.Y. 2013) ("Likewise, *Collier* explains that '[t]he words "under a law relating to insolvency or adjustment of debt" [in section 101(23)] emphasize that chapter 15 is available not only to debtors that are technically insolvent or facing liquidation, but also to debtors who are in financial distress and may need to reorganize.'" (quoting 8 Collier ¶ 1501.03 (16th 2018))).  Moreover, the phrase "relating to" is interpreted broadly.  *See, e.g.*, *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013) ("ordinary meaning of . . . words ['relating to'] is a broad one") (citation omitted); *California Div. of Lab. Standards Enf't v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 335 (1997) (Scalia, J., concurring) ("[A]pplying the 'relate to' provision according to its terms was a project doomed to failure, since, as many a curbstone philosopher has observed, everything is related to everything else.").  Here there is little doubt that the French Proceeding conducted under the French Law is a proceeding under either (a) "a law relating to insolvency" or (b) "a law relating to . . . adjustment of debt."

62.     With respect to the "relating to" provision, the expression "pursuant to a law relating to insolvency" refers to proceedings involving companies that are insolvent or in severe financial distress.  *See* UNCITRAL Model Law on Cross-Border Insolvency with Guide to Interpretation and Enactment (January 2014) at 73.  An expedited financial safeguard proceeding is governed by Book VI of the French Commercial Code, a section that governs corporate

restructurings and is recognized as an insolvency proceeding under the Council Regulation (EC) Regulation No. 1346/200 dated May 29, 2000, on Insolvency Proceedings (as modified) and the recasting Regulation No. 2015/848, dated May 20, 2015, on Insolvency Proceedings.  One of the conditions for the opening of expedited financial safeguard proceedings in relation to a debtor under the French Law is whether the debtor has not been insolvent for more than 45 days at the time that the petition for conciliation was filed, while still experiencing difficulties.  At the outset of the French Proceeding, the French Court found that the Debtor satisfied this test. Furthermore, the purpose of an expedited financial safeguard proceeding is to seek to reorganize a debtor through an expedited financial safeguard plan, which is similar to a plan of reorganization under the Bankruptcy Code.

63.    ***Sixth***, the French Proceeding subjects the Debtor's assets and affairs to the supervision of the French Court for the duration of the proceeding.  As an example, the *juge-commissaire* must authorize any sale of the Debtor's assets outside the ordinary course of business, or the granting of any security interest in the Debtor's assets, and an automatic stay arose upon entry of the Opening Judgment that prohibits payment of certain prepetition debt and enjoins creditors from commencing or continuing legal actions against the Debtor to obtain payment. Moreover, a court-appointed administrator, whose duties are determined by the French Court, assists the Debtor's management or monitors the Debtor and reports back to the French Court with any issues requiring the French Court's input.  Additionally, as mentioned above, the French Court must also approve the SFA Plan (including any reorganization of the debtors' assets and affairs regulated under the SFA Plan) for the SFA Plan to take effect.

64.    ***Finally***, the objective of the French Proceeding is the reorganization of the Debtor. The principal objective of the French Proceeding is to facilitate the reorganization of a business

through approval of the SFA Plan in order that the Debtor's business operations may be continued, the employment of its personnel maintained, and its liabilities restructured.  The SFA Plan will provide for a recapitalization of the Debtor and will govern the global financial restructuring of the Debtor's indebtedness.  Therefore, the Foreign Representative submits that the Debtor has commenced the French Proceeding for the purpose of reorganization, as required by section 101(23) of the Bankruptcy Code.  *Cf. In re Avánzit*, 385 B.R. at 533–34 (recognizing a "financial restructuring" as a "reorganization" for purposes of the sections 101(23) and 1517 analysis, especially where debts will be repaid through the plan at issue).

65.     The Foreign Representative submits that the French Proceeding satisfies all of the criteria required under section 101(23) of the Bankruptcy Code and that the French Proceeding is a foreign proceeding entitled to recognition under chapter 15 of the Bankruptcy Code.

**B.     The French Proceeding Is a Foreign Main Proceeding.**

66.     The French Proceeding should be recognized as a "foreign main proceeding" as defined in section 1502(4) of the Bankruptcy Code.  A foreign proceeding must be recognized as a "foreign main proceeding" if it is pending in the country where the debtor has its center of its main interests.  11 U.S.C. § 1517(b).  The term "center of main interests" (or "<u>COMI</u>") is not defined in the Bankruptcy Code.  COMI, however, has been equated to a debtor's principal place of business.  *See In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122, 129 (Bankr. S.D.N.Y. 2007), *aff'd*, 389 B.R. 325 (S.D.N.Y. 2008) (citing *In re Tri-Continental Exchange Ltd.*, 349 B.R. 627, 633–34 (E.D. Calif. 2006)).  Courts have identified certain factors that are relevant in determining a debtor's COMI, including:  (a) the location of the debtor's headquarters; (b) the location of those persons or entities that actually manage the debtor (which, in certain instances, could be the headquarters of a holding company); (c) the location of the debtor's primary assets; and (d) the location of the majority of the debtor's creditors or of a

28

majority of the creditors who would be affected by the case.  *See Lavie v. Ran* (*In re Ran*), 607

F.3d 1017, 1023 (5th Cir. 2010) (citing *In re SPhinX, Ltd.*, 351 B.R. 103, 117 (Bankr. S.D.N.Y.

2006).  In the absence of evidence to the contrary, a debtor's registered office is presumed to be

the debtor's COMI.  *See* 11 U.S.C. § 1516(c).

      67.    Here, under all the relevant criteria, France is the Debtor's COMI.  As set forth in

the Carozzi Declaration:

    a.    the Debtor's registered office and corporate headquarters are located at 8-10 rue du Renard, 75004 Paris, France;

    b.    the Debtor is primarily controlled by, and decision-making is made from, its headquarters in Paris, France;

    c.    the Debtor is a publicly traded company listed on the Euronext Paris Exchange;

    d.    the majority of the Debtor's shares are held by major French corporations;

    e.    substantially all of the Debtor's employees, assets, and operations are located in France; and

    f.    a material portion of Technicolor's administrative functions, including accounting, financial reporting, budgeting, and cash management, are conducted in France.

      68.    Courts have found COMI in other chapter 15 cases that had fewer connections than

those present here.  *See, e.g.*, *In re Gandi Innovations Holdings, LLC,* No. 09-51782-C, 2009 WL

2916908, at *2 (Bankr. W.D. Tex. June 5, 2009) (finding Canada to be debtor's COMI despite

mixed results, for example, senior management was located in Ontario, but assets, employees, and

operations were both in Texas and Ontario); *In re Ernst & Young, Inc.*, 383 B.R. 773, 780–81

(Bankr. D. Colo. 2008) (finding COMI in Canada notwithstanding the fact that two of the factors—

the location of the debtors' creditors and applicable law—yielded inconclusive and possibly

contrary results).  Based on foregoing factors, the Debtor's COMI is in France and, as such, the

French Proceeding should be recognized as a foreign main proceeding.

**C.      In the Alternative, the French Proceeding is a Foreign Nonmain Proceeding.**

69.      In the alternative, if this Court concludes that the Foreign Proceeding is not a "foreign main proceeding," the French Proceeding should be recognized as a "foreign nonmain proceeding" under section 1502(5) of the Bankruptcy Code.

70.      A "foreign nonmain proceeding" is defined as "a foreign proceeding, other than a foreign main proceeding, pending in a country where the debtor has an establishment." *See* 11 U.S.C. § 1502(5); *see also* 11 U.S.C. § 1517(b)(2) (providing that an order of recognition as a "foreign nonmain proceeding" shall be entered "if the debtor has an establishment within the meaning of section 1502 in the foreign country where the proceeding is pending").   An establishment is "any place of operations where the debtor carries out a nontransitory economic activity."   11 U.S.C. § 1502(2).   "Nontransitory economic activity" is not defined in the Bankruptcy Code, but has been referred to as 'a local place of business.'"   *See In re Creative Fin. Ltd.*, 543 B.R. 498, 520 (Bankr. S.D.N.Y 2016) (holding that in order to have an establishment in a country a debtor must "conduct business in that country."); *see also Lavie v. Ran*, 607 F.3d 1017, 1027 (5th Cir. 2010) (holding that the definition of establishment requires "a place from which economic activities are exercised on the market (i.e. externally), whether the said activities are commercial, industrial or professional."); *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122, 131 (Bankr. S.D.N.Y 2007) (holding that the requirements of a "place of operations" from which "economic activity" is conducted require a seat for local business activity that has a local effect on the markets); *In re British Am. Ins. Co.*, 425 B.R. 884, 915 (Bankr. S.D. Fla. 2010) (holding same).   As with determining a debtor's COMI, courts determine whether a debtor has an establishment in a country as of the time of the filing of the chapter 15 petition.   *See Lavie v. Ran (In re Ran)*, 406 B.R. 277, 284–85 (S.D. Tex. 2009).

71.     As described above, the Debtor maintains its corporate office in Paris, France where officers execute treasury functions and approve key vendor payments.  Further, most board meetings are chaired and convened at the Paris office, and Paris is where the Debtor has managed the restructuring.  Given the material and substantive activities conducted by the Debtor in Paris, and the Debtor's corporate office being located in Paris, the Debtor demonstrably has a local and non-transitory place of business, and hence, an establishment, in France.

**D.     The Chapter 15 Case Has Been Commenced by a Duly Authorized Foreign Representative.**

72.     Section 1517 of the Bankruptcy Code provides that a "foreign representative" shall apply for recognition of the foreign proceeding.  Section 101(24) of the Bankruptcy Code defines "foreign representative":

> The term "foreign representative" means a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding.

11 U.S.C. § 101(24).

73.     The relevant authorizing board of the Debtor previously met and appointed by resolution the Foreign Representative for purposes of this chapter 15 case.  Bankruptcy courts have held that a governing body of an entity may authorize a person to act as that entity's foreign representative in a chapter 15 proceeding.  *See In re Vitro, S.A.B. de C.V.*, 470 B.R. 408, 412 (N.D. Tex. 2012), *aff'd sub nom.*, *In re Vitro S.A.B. de CV*, 701 F.3d 1031, 1047 (5th Cir. 2012), *cert. dismissed*, 133 S. Ct. 1862 (2013) (recognizing that the board of directors of a corporation could authorize a person to act as the corporation's foreign representative in a chapter 15 proceeding); *In re Cell C Proprietary Ltd.*, 571 B.R. 542, 553 (Bankr. S.D.N.Y. 2017) (recognizing that "section 101(24) does not require that a foreign representative be judicially appointed" and "that a board of

31

directors may authorize a person to act as the corporation's foreign representative in a chapter 15 proceeding"); *see also In re OAS S.A.*, 533 B.R. 83, 98 (Bankr. S.D.N.Y. 2015) (holding that individual appointed by board qualified as a "foreign representative"); *In re Compania Mexicana de Aviacion, S.A. de C.V.*, No. 10-14182 (MG), 2010 WL 10063842 at *2 (Bankr. S.D.N.Y. Nov. 8, 2010) (same).   The Foreign Representative is a "person" under section 101(41) of the Bankruptcy Code.   The Foreign Representative thus submits that he has met the requirements of section 101(24) of the Bankruptcy Code and is the Debtor's "foreign representative" as defined therein.

### E.     The Petition Satisfies the Requirements of Section 1515 of the Bankruptcy Code.

74.     Pursuant to section 1515(b) of the Bankruptcy Code, a petition for recognition must be accompanied by one of the following:

    a.    a certified copy of the decision commencing such foreign proceeding and appointing the foreign representative;

    b.    a certificate from the foreign court affirming the existence of such foreign proceeding and of the appointment of the foreign representative; or

    c.    in the absence of evidence referred to in paragraphs (1) and (2), any other evidence acceptable to the court of the existence of such foreign proceeding and of the appointment of the foreign representative.

75.     In satisfaction of section 1515(b) of the Bankruptcy Code, the Carozzi Declaration describes the existence of the French Proceeding and the appointment of the Foreign Representative as the "foreign representative" of the Debtor, independently satisfying section 1515(b)(3) of the Bankruptcy Code.[14]   *See In re ABC Learning Centres Ltd.*, 445 B.R. 318, (Bankr. D. Del. 2010) (holding that declaration of petitioner "is acceptable evidence under

---

[14]     The Foreign Representative will also file a copy of the Opening Judgment when it becomes available.

§ 1515(b)(3) of the existence of the foreign proceeding and the appointment of the [f]oreign [r]epresentatives."), *aff'd*, 728 F.3d 301 (3d Cir. 2013).   Therefore, the Petition meets the requirements of section 1515 of the Bankruptcy Code in satisfaction of the third requirement under section 1517(a) of the Bankruptcy Code.   Because the Petition satisfies section 1517 of the Bankruptcy Code, the Court should recognize the French Proceeding in this chapter 15 case. Moreover, granting recognition will promote the United States public policy of respecting foreign proceedings as articulated in, *inter alia*, sections 1501(a) and 1508 of the Bankruptcy Code and further cooperation between courts to the maximum extent possible as mandated by section 1525(a) of the Bankruptcy Code.   Thus, these circumstances satisfy the conditions for mandatory recognition of the French Proceeding under section 1517 of the Bankruptcy Code.

### III.    The Automatic Stay Should Be Modified to Be Coterminous with the Stay in Effect in the French Proceeding.

76.    Normally, recognition of a foreign proceeding as a "foreign main proceeding" triggers the application of the automatic stay under section 362 of the Bankruptcy Code to the debtor and the property of the debtor that is within the territorial jurisdiction of the United States. 11 U.S.C. § 1520(a)(1).  Such a stay would be more expansive than the stay in effect in the French Proceeding, which only applies to financial (but not trade) creditors, with the potential unintended effect of disrupting the Debtor's commercial relationships with its trade creditors and ongoing operations.  Accordingly, the Debtor respectfully requests, pursuant to sections 105(a), 362(a), and 362(d) of the Bankruptcy Code, that the automatic stay be deemed modified to apply only to those matters stayed in the French Proceeding.  *See United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs. Ltd.*, 484 U.S. 365, 370 (1988) (holding that parties in interest may file for relief from the automatic stay); *In re Cypresswood Land Partners, I*, 409 B.R. 396, 415 (Bankr. S.D. Tex. Jan. 20, 2009) (noting that debtors are "parties in interest" as set forth pursuant to section

1109 of the Bankruptcy Code); *In re Buccaneer Res., LLC*, 2015 WL 8527424, at \*4 (Bankr. S.D. Tex. Dec. 10, 2015) (referencing a prior bankruptcy court order granting debtor's motion to modify the automatic stay to permit their insurers to advance certain defense costs).

77.     The opening of the French Proceeding triggered an automatic stay that prohibits payment of prepetition debts to financial creditors of the Debtor and prevents financial creditors impacted by the French Proceeding from commencing or continuing legal actions against the debtor to obtain payment of a prepetition claim, subject to certain exceptions.  Payment to and enforcement by trade creditors is not stayed by the French Proceeding, as such creditors are expected to "ride through" the Debtor's (purely financial) restructuring under applicable French law.  Accordingly, cause exists to modify the stay in this limited fashion to apply only to those matters stayed in the French Proceeding because such relief will permit the Debtors to continue to satisfy its obligations to its trade creditors in accordance with applicable law (including French law).

**IV.     Recognition of the French Proceeding Is Not Contrary to U.S. Public Policy.**

78.     A court may deny a request for any chapter 15 relief that would be "manifestly contrary to the public policy of the United States."  11 U.S.C. § 1506.  Courts that have addressed the "public policy exception" in section 1506 of the Bankruptcy Code have noted that the exception is narrow, its application restricted to the most fundamental policies of the U.S., and a foreign judgment should generally be accorded comity if the foreign jurisdiction's proceedings meet fundamental standards of fairness.  *Oilsands Quest Inc.*, 484 B.R. 593, 597 (Bankr. S.D.N.Y. 2012); *see also In re Metcalfe*, 421 B.R. at 697 (holding that a U.S. bankruptcy court is not required to make an independent determination about the propriety of the acts of a foreign court, but only whether their procedures meet U.S. standards of fundamental fairness).  The relief granted in a foreign proceeding and the relief available in a U.S. proceeding need not be identical.  Courts have

even gone so far as to hold that even the absence of a jury trial right—a right embodied in the U.S. Constitution—in a foreign proceeding would not justify the court's refusal to recognize the foreign proceeding pursuant to the public policy exception. *See In re Ephedra Products Liab. Litig.*, 349 B.R. 333, 335–36 (Bankr. S.D.N.Y. 2006).

79.     Here, recognition of the French Proceeding, and any orders issued by the French Court during the pendency of the French Proceeding, would not be "manifestly contrary to the public policy of the United States" so as to justify refusal to recognize the French Proceeding and enforce the French Court's order.  As more fully set forth in the Dubois Declaration, the French Proceeding affords the Debtor's stakeholders—including its creditors and equity holders—a full and fair opportunity to participate therein, consistent with U.S. standards of fundamental fairness.

## Conclusion

80.     The Petition satisfies the requirements for the recognition of the Foreign Representative as the Debtor's "foreign representative" and the French Proceeding as the Debtor's "foreign main proceeding," or, in the alternative, the Debtor's "foreign nonmain proceeding" and further requests entry of an order, substantially in the form attached hereto, granting the relief requested herein.

## Notice

81.     The Foreign Representative will provide notice of this motion to:  (a) the Office of the United States Trustee for the Southern District of Texas; (b) counsel to the agent under the Euro RCF Credit Agreement; (c) counsel to the ad hoc group of Term Loan Lenders; (d) the agent under the Term Loan Credit Agreement; (e) the Term Loan Lenders; (f) the Euro RCF Lenders; (g) counsel to the agent under the Wells Fargo RCF Credit Agreement; (h) counsel to the Bridge Loan Lenders; (i) all persons authorized to administer the foreign proceeding of the Debtor; (j) all

parties to litigation pending in the United States in which the Debtor is a party as of the Petition Date; and (k) such other entities as this Court may direct.  In light of the nature of the relief requested, the Foreign Representative submits that no further notice is required.

WHEREFORE, the Foreign Representative requests entry of the Order, substantially in the form attached hereto, granting the relief requested herein and such other and further relief as is just and proper.

Houston, Texas
June 22, 2020

*/s/ Matthew D. Cavenaugh*

**JACKSON WALKER L.L.P.**

Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer E. Wertz (TX Bar No. 24072811)
Veronica A. Polnick (TX Bar No. 24079148)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:      (713) 752-4200
Facsimile:      (713) 752-4221
Email:         mcavenaugh@jw.com
               jwertz@jw.com
               vpolnick@jw.com

*Co-Counsel to the Foreign Representative*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**

David R. Seligman, P.C. (*pro hac vice* pending)
Brad Weiland (*pro hac vice* pending)
Christopher M. Hayes (*pro hac vice* pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:         david.seligman@kirkland.com
               brad.weiland@kirkland.com
               christopher.hayes@kirkland.com

*Co-Counsel to the Foreign Representative*

## <u>VERIFICATION OF PETITION</u>

I, Laurent Carozzi, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States of America as follows:

I am the authorized foreign representative for the Debtor.  As such, I have full authority to verify the foregoing Petition on behalf of the Debtor.

I have read the foregoing Petition, and I am informed and believe that the factual allegations contained therein are true and accurate to the best of my knowledge, information, and belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: June 22, 2020

_____

By:  Laurent Carozzi
Chief Financial Officer and Executive
Committee Member
Technicolor S.A.